FILED

2010 Mar-30  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BENJAMIN L. FLOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  5:08-cv-0582-SLB** |
| | ) | |
| **FEDERAL EXPRESS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 33.)[1] Plaintiff Benjamin L. Floyd has sued his former employer, defendant Federal Express Corporation, alleging that defendant terminated him on the basis of his race and in retaliation for complaining about discrimination.[2] Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 33), is due to be granted.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

[2] Defendant's Motion for Summary Judgment argues that it is entitled to judgment as a matter of law as to plaintiff's claims of disparate treatment and retaliation based on disciplinary actions and job assignments. Plaintiff's Complaint, however, is limited to discrimination and retaliation based on his termination.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mut. Ins. Co.*, 193

F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988))(emphasis added).

## II.  STATEMENT OF FACTS

Plaintiff Ben Floyd is a black male.  (Doc. 33, Ex. F, ex. 1.)   At the time of his termination, he was working as a Security Police Officer for the Department of the Army at Redstone Arsenal and as a part-time Courier for defendant FedEx on the evening or "p.m." shift.  (*Id*. at 13-16, 18.)

Plaintiff's immediate supervisor at FedEx was Scott Hurst.  (Doc. 33, Ex. F at 39.) Hurst was an Operations Manager on the p.m. shift.  (*Id*., Ex. K at 1-6.)  Gary Wade, Senior Manager of Station Operations, was Hurst's supervisor.  (*Id*. at 7; *id*., Ex. F at 43; *id*., Ex. H at 6.)  Jeffrey Walker was Managing Director of the Delta District, which included north Alabama.  (*Id*., Ex. J at 4.)  Wade reported directly to Walker.  (*Id*. at 5.)

Although plaintiff was classified as a Courier, he actually worked as a Courier only on Monday; Tuesday through Friday he performed the job duties of a Handler.  (*Id*., Ex. K at 55.)  His "unique schedule" was an accommodation for his day job to allow him to start work at FedEx later on Tuesday through Friday.  (*Id*., Ex. H at 128-29.) The Courier position is a higher pay grade than the Handler position.  (*Id*., Ex. K at 18.)  Plaintiff's pay remained the same after his job duties changed.  (*Id*., Ex. H at 129.)

Defendant assigned plaintiff and other part-time black Handlers the duty of sweeping defendant's 80 trucks over the course of the week.  (Doc. 33, Ex. F at 85-86, 91-92.)

3

Plaintiff, as well as David McNair, Altrice Harris, and O'Shaughnessy Allen, who were black, part-time Handlers on the p.m. shift, were assigned to sweep the trucks.  (*Id.*, Ex. F at 93 and ex. 17; *id.*, Ex. H at 126.)  Plaintiff received a Letter of Expectations from Hurst, which stated in part, "After the trucks are loaded and unloaded, begin your extra duties. Perform each extra duty you are assigned.  . . .  8.  Clean your assigned trucks and sign off on the form.  ([D]avid, [B]en, [A]ltrice, and O)."  (*Id.*, Ex. F, ex. 17.)  Wade testified that defendant assigned the extra duties to give each Handler sufficient work to fill the minimum required hours; he stated:

> [Defendant has] attempted at times to assign trucks to handlers and couriers who work the p.m. to give them the number of hours.  [Defendant has] a guaranteed minimum; as a part-time employee, if you do not work 17-1/2 hours which are available, you will get 17-1/2 hours of pay.  . . .  If your job duties don't take you up to that minimum level . . ., [defendant will] try to structure work to take people to that level, if possible, but not be unproductive.

(*Id.*, Ex. H at 123.)

Defendant did not require Kevin Bowers, a white part-time Handler on the p.m. shift, to sweep the trucks.  (Doc. 33, Ex. F at 93-94; *id.*, Ex. K at 55.)  However, Bowers performed additional duties related to hazardous materials, and, therefore, he had enough work to fill the mandatory 17 and 1/2 hours.  (*Id.*, Ex. F at 94-95; *id.*, Ex. H at 129.)

Another white Handler on the p.m. shift was not assigned the duty to sweep the trucks. (*Id.*, Ex. F at 95-96.)  She had enough work to file her mandatory hours because she completed the customs paperwork for international shipments.  (*Id.*, Ex. H at 129-30.)

4

Plaintiff claims that he and the other employees were not required to clean out the trucks between January 4, 2006 and April 20, 2006.[3]  (*Id.*, Ex. F at 180.)  On April 20, 2006, plaintiff gave a written statement to defendant, which read, "During the months of October through January 2004 to 2005 I was on TRW[4] and was only allowed to work 2-3 hours per night."  (*Id.*, Ex. F, ex. 18.)  He prepared this statement in support of Kelly Deloney, a black employee who had complained that defendant required her to work more hours than other employees on light duty because she was pregnant.  (*Id.*, Ex. F at 104-05; *id.*, Ex. G at 13.)  Plaintiff testified that the first time defendant required him to clean the trucks was shortly after he gave this statement.  (*Id.*, Ex. F at 105-06.)  However, he also testified that he received the Letter of Expectations in January 2006 and did not make his statement for Deloney until April 2006.  (*Id.* at 106.)

Plaintiff complained to Hurst about black employees being assigned the duty of cleaning out the trucks and plaintiff "told [Hurst] that [he] had heard that Rita [Howard] say that Gary [Wade] was trying to get rid of the black employees."  (*Id.*, Ex. F at 118-19.)  On October 21, 2005, Howard, a black manager, allegedly said to Harris, "Did you know that Gary['s] talking about wanting to take your job and get rid of you[?]  You know he's trying

_____

[3]Harris testified that she and other handlers started cleaning out the trucks before she received a Letter of Expectations on January 31, 2006.  (Doc. 33, Ex. L at 79-80 and ex. 4.)  For purposes of summary judgment the court assumes that plaintiff was not required to clean out trucks until after April 20, 2006.

[4]"TRW" refers to light duty work under defendant Temporary Return to Work policy.  (Doc. 33, Ex. F, ex. 14.)

to get rid of . . . black folks especially[.]  Gary is talking about putting someone white to replace you."  (*Id*., Ex. H, ex. 20 at 35-321 [original emphasis omitted]; *id*., Ex. D, ex. A at 35-333; *id*., Ex. L at 18, 20, 80.)  Howard denied making the statement.  (*Id*., Ex. D, ex. A at 35-333; *id.*, Ex. G at 32-33.)  Harris filed an internal discrimination complaint in July 2006, and included a claim based on the alleged statement from Wade.  (*Id*., Ex. H, ex. 20.) On August 31, 2006, defendant sent Harris a letter, which stated that, after an investigation of her claims, it had found no policy violations.  (*Id*., ex. 22.)

Plaintiff testified that he complained about cleaning out the trucks to Judy Parker, an employee of defendant's Human Resources Department on a couple of occasions.  (*Id*., Ex. F at 107-09.)  Also, he complained to Parker that he had heard Hurst and Howard say that Wade had "said that he trying to fire the black people."

On the evening of August 31, 2006, Kevin Bowers, a white Handler,[5] saw David McNair, a black Handler, loading a container, called a "can", onto a truck, and, according to plaintiff's testimony, Bowers "assumed that he needed help."  (*Id*., Ex. F at 121.)  Plaintiff testified that McNair did not ask for his help loading the can and, if he had asked, plaintiff would have helped him."  (*Id*.)  Bowers testified that he saw McNair "struggling with the can," while he was "trying to push the can onto the [truck]."  (*Id*., Ex. M at 16.)  He said that

---

[5]Hurst testified that Bowers was the "reload captain . . . so he sets things up on the p.m. [shift], and he's also the person in charge when I'm not there."  (*Id*., Ex. K at 17.)

plaintiff was just watching McNair.  (*Id*. at 7-8.)  At the time, plaintiff was on the telephone talking to his wife.  (*Id*., Ex. F at 122-23.)

Bowers left his work station and went to help McNair; as he passed plaintiff, Bowers called plaintiff a "sorry mother-fucker" and told him he was "lazy." (*Id*., Ex. F at 121, 123.) Bowers did not use any explicit racial epithets.  (*Id*. at 123.)  Bowers proceeded to the truck and he helped McNair push the can into the truck.  (*Id*. at 124.)  Plaintiff testified that he followed Bowers and that he also helped McNair push the can;  however, McNair and Bowers, in statements given that day, indicated that plaintiff did not help load the can.  (*Id*. at 125; *id*., ex. H, ex. 6 at 3-204 and ex. 7.)  This can was one of the first cans loaded onto the truck.  (*Id*., Ex. F at 125.)  Therefore, it went "as deep as [it] could go into the trailer." (*Id*. at 126.)

Plaintiff testified that Bowers pointed his finger at plaintiff while they were inside the truck.  (*Id*., Ex. F at 127-28.)  He testified that he had pushed Bowers's hand out of his face. (*Id*. at 128.)  He denied taking a swing at Bowers.  (*Id*.)  He also testified that, at this point, McNair grabbed Bowers.  (*Id*.)   However, McNair testified that he had stepped between plaintiff and Bowers.  (*Id*., Ex. I at 15-16.)  Several employees were present that evening to witness the incident, including Harris, Sheyla Abston, and Dennis Mitchell.  (*Id*., Ex. F at 129-30.)  Only plaintiff, Bowers, and McNair were inside the truck.  (*Id*. at 126.)

Bowers reported the incident to Hurst.  (*Id*., Ex. K at 9.)  Hurst testified Bowers had told him that plaintiff had taken "a swing at him and grazed his chin, [and] hit him in the arm.

7

And then David McNair broke it up and walked [plaintiff] out of the trailer." (*Id.*) That night, Hurst interviewed plaintiff, Bowers, McNair, Harris, and Abston. (*Id.* at 13; *id.*, Ex. H, ex. 4.) The notes of his interviews did not mention any physical contact between plaintiff and Bowers. (*Id.*, Ex. K at 10; *id.*, Ex. H, ex. 4.) Hurst noted that McNair told him that plaintiff had taken a swing at Bowers.[6] (*Id.*, Ex. H, ex. 4.) He also noted that plaintiff told him that Bowers had asked him why was his "sorry ass" not helping McNair and that plaintiff had followed Bowers, saying, "[You're] not my boss." (*Id.*) Harris told Hurst that she had observed plaintiff and Bowers "cuss[ing] each other out but no punching, no [gesturing], [and] no fighting." (*Id.*) In a follow-up statement, Harris told Hurst that she had seen plaintiff and Bowers arguing and that McNair "was in the middle." (*Id.*).

Hurst informed plaintiff that there was a video tape of the incident. (*Id.*, Ex. F at 134.) Hurst did not preserve the video tape. (*Id.*, Ex. K at 63-64.) According to plaintiff, Hurst told him, "We can see what happened between you and Kevin on the beginning, but we couldn't see inside the truck."[7] (*Id.*, Ex. F at 134-35.)

That night and the following day, Hurst received written statements from plaintiff, Bowers, McNair, Harris, and Abston. (*Id.*, Ex. H, exs. 6 and 7.) Plaintiff recounted the incident as follows:

---

[6]McNair testified that he had not seen any physical contact between Bowers and plaintiff, but he did see plaintiff take a swing at Bowers. (*Id.*, Ex. I at 9, 16.) He testified that plaintiff could have made contact, but that he did not know. (*Id.* at 16.)

[7]Hurst denied any discussion of any video tape and he testified that he did not know of any security camera pointed at the dock sort area or inside the truck. (*Id.*, Ex. K at 63-64.)

> Tonight while doing docs [Kevin] came to me talking crazy about why can't my sorry ass help Dave put the can in the truck. I told him I didn't see Dave because I was counting docs. He went on talk[ing] shit about how lazy [I was]. I told him that he was not my boss and I don't need to hear his shit. He went [on] talking and that [was] when Dave got between us.

(*Id.*, Ex. H, ex. 6 at 3-201.) Bowers's version of the night's events stated:

> At approximately 18:30 I was in the DG Cage looking when I turned around and saw Dave struggling to load a container onto a CTV.

> I stopped what I was doing and went toward the CTV and saw [B]en. I asked [Ben] don't you see him struggling [trying] to load that can. [B]en said he was working and for me to take my punk ass up there and help him.

> I helped Dave load the can, and while we were locking [the] can into position [B]en came up behind me and took a swing at me. I made a comment to [B]en that if he called me a punk ass again we would tangle.

> [B]en told me, I told you once you don't run this show.

(*Id.*, ex. 7.) McNair's statement told about the incident as follows:

> On the night of August 31, 2006, I, David McNair, witnessed a confrontation between Kevin Bowers and Ben Floyd. It began as I was loading a ULD into a tractor-trailer by myself. Kevin noticed that I was loading a ULD alone. As he approached the lift, Kevin then asks Ben if he could help me load the ULD. Ben responded with an answer, which I didn't quite make out. Kevin then began to help me load the ULD on to [the] trailer himself. After we loaded the ULD into the tractor[-] trailer we then turned to exit the trailer. At that point Ben walked inside the trailer and confronted Kevin and an argument began as to whose responsibility it was to assist me with this task. The argument escalated to the point that Ben attempted to hit Kevin, at which point I stepped in between Ben and Kevin to prevent any physical contact between these two individuals. It is my belief that the argument between these guys did not warrant Ben [attempting] to hit Kevin . . . . Ben was completely out of line in the manner with which he attempted to resolve the situation between Kevin and [h]imself.

(*Id.*, ex. 6 at 3-204.) Sheyla Abston provided a written statement, which said:

> Last night on the sort I was taking Altrice [two] first overnight packages, and when I handed the packages to Altrice, I saw Ben and Kevin arguing in the truck. I did not know what was going on. I just saw arguing. David was in between Kevin and Ben to resolve the arguing. All I heard was cussing, and just bickering back and forth. Ben walked away and Kevin kept arguing and walked away and that was it. I did not see any punching, or swinging, or hitting of any sort.

(*Id*. at 3-202.) Harris's statement was as follows:

> I was standing on the side of the belt retrieving docs, Ben was scanning docs and his cell phone began to ring[.]  [H]e answered, and the next thing I heard/saw was [K]evin lean[ing] towards [B]en and shout[ing] that he was a sorry motherfucker.

> [B]en put down the cell phone and asked [K]evin what did he say and he shouted again that he was a sorry motherfucker because he [had] seen that [D]ave needed help with the can. Ben said if [I had] seen he needed help [I] would have helped. [K]evin said again that you are just a sorry motherfucker and [K]evin mumbled something else and if you can't hear come up [here]. [A]nd [B]en went up in the can, [D]avid and [K]evin was walking back out of the can and [K]evin and [B]en was still arguing loudly. [B]en [proceeded] to come back [to] the doc sort and scan and [K]evin started walking past the doc sort and still arguing and [B]en said mad just leave it alone, squash it and dammit and [K]evin said fuck you and [B]en said fuck you too.

(*Id*. at 3-203.) Harris testified that she had witnessed the altercation, but that she had not seen plaintiff, Bowers, and McNair while they were in the truck. (*Id*., Ex. L at 13-14.) None of the written statements explicitly stated that plaintiff had actually hit Bowers, although both McNair and Bowers stated that plaintiff had taken a swing at Bowers.[8]

---

[8]Dennis Mitchell gave a written statement on the incident on September 11, 2006. (Doc. 33, Ex. H, ex. 14.)  He noted:

> On August 31, 2006, I returned to the station as usual. I began to walk to (gate keeping) courier check in and noticed that what I thought was a playful

10

Hurst suspended plaintiff that night; he suspended Bowers the following morning before his shift began.  (*Id.*, Ex. K at 22-23.)  Hurst testified that Bowers had clocked out and left before he could be suspended that evening.  (*Id.*)  Hurst and Wade reviewed the written statements, Hurst's notes, and Hurst's recollection of Bowers's oral report of the incident.  (*Id.* at 67; *id.*, Ex. H at 49-50, 58.)  Wade and Hurst, in consultation with Parker, decided to terminate plaintiff.  (*Id.*, Ex. H at 58.)  Wade testified that he credited the statements of McNair and Bowers because they were inside the trailer.  (*Id.* at 56-57.)  He found Abston and Harris "were outside the truck and really would not be [able] to see the action take place."  (*Id.* at 57.)  Hurst testified, "The only three people who knew exactly what happened [were the] only three people in the trailer."  (*Id.*, Ex. K at 37-38.)

The morning of September 5, 2006, Wade sent an e-mail to Walker and Judy Parker; this email stated:

> In questioning the person who was swung at Friday, the swing did land a glancing blow on him as he turned away from the swing.  The other handler who witnessed it said, that if it did hit him it was not straight on due to the fact he turned away as he saw the swing coming.  So their stories back each other up and they were given independent of each other.

> Looks as if this only solidifies the termination of the handler who swung (but denies it).  We also will proceed with a warning letter for the person who was swung at for cursing at the other handler during this incident.

---

conversation.  I only saw verbal exchange between Ben Floyd and Kevin Bowers.  They were facing each other but no pushing, only verbal exchange between the two."

(*Id.*)

I plan to move forward with both today.

(*Id.*, Ex. J, ex. 24.)

Hurst terminated plaintiff for striking Bowers on September 5, 2006.  (*Id.*, Ex. F, ex. 23.)  Walker, who did not make the decision to terminate plaintiff, testified that "the only reason Ben Floyd was terminated was . . . because of the alleged striking of Kevin Bowers." (*Id.*, Ex, H at 58; *id.*, Ex. J at 22.)  However, Hurst testified, "If it [had been] determined that he took a swing at Kevin with the intent to cause harm, . . . I'm sure he would have been terminated."  (*Id.*, Ex. K at 46.)  The termination memorandum from Hurst to plaintiff stated, "After a thorough investigation, it has been determined that you are in violation of Acceptable Conduct, 2-5.  Specifically, you struck a fellow employee after a verbal confrontation.  Therefore, the decision has been made to terminate your employment effective September 5, 2006."  (*Id.*, Ex. F, ex. 23.)

The same day plaintiff was terminated, Hurst sent Bowers a Warning Letter "for using profanity toward another employee.  (*Id.*, Ex. H, ex. 11.)

Plaintiff asked for a review of the termination decision as part of the GFT policy.  (*Id.* at 72.)  The GFT or "Guaranteed Fair Treatment" policy is a three step process whereby an employee asks for a review of a disciplinary decision.   The first step is a conference with the employee, his manager and the managing director to allow the employee an opportunity to discuss the fairness of the decision.  (*Id.* at 72; *id.*, Ex. J at 9.)  If the employee is not satisfied with the decision after this meeting, he can appeal to the regional vice-president for

review.  (*Id*., Ex. H at 72-73; *id*., Ex. J at 10.)   If the employees is not happy with the response, he may appeal to a corporate board of appeals.  (*Id*., Ex. H at 73; *id*., Ex. J at 10.)

As part of this review, Parker asked for another written statement from Bowers to clarify whether plaintiff actually made contact with Bowers.  (*Id*., Ex. K at 33.)   On September 8, 2006, Wade asked Bowers for a second statement.  (*Id*., Ex. H, ex. 13; *id*., Ex. M at 17-18.)  Wade testified, "As a part of the review, HR . . . stated that there was nothing in writing regarding . . . Mr. Floyd striking Mr. Bowers and that if that in fact . . . did happen, we needed that in writing.  So at that point, Mr. Bowers was asked to . . . add a statement concerning what happened with the physical striking, if it did occur."  (*Id*. at 51-52 and ex. 13.)  Bowers's September 8, 2006, statement notes, in part, "Ben Floyd came onto the trailer we were loading.  As we turned from securing the ULD and started to exit the [trailer] Ben took a swing at me with his right arm, closed fist making contact with my lower chin and grazing my right arm."  (*Id*., ex. 12.)

On November 10, 2006, defendant concluded the GFT review and found no policy violations.   Plaintiff filed an EEOC charge on January 29, 2007, alleging defendant terminated him based on race discrimination and retaliation.  (Doc. 33, Ex. F, ex. 1.)

Plaintiff alleges that McNair and a white employee, were involved in a physical altercation.  (*Id*., Ex. F at 136-38.)  Plaintiff testified that McNair pushed Josh Burnette, who is white, and neither employee was terminated.  (*Id*. at 136-37, 140.)  Burnette did not take

a swing at McNair.  (*Id*. at 140.)  Hurst testified that he was unaware of this incident until

after the plaintiff was terminated.  (*Id*., Ex. K at 47, 49.)

## III.  <u>DISCUSSION</u>

In this circuit –

Where direct evidence of discrimination is absent, a plaintiff establishes
a circumstantial, prima facie case of racial discrimination based on disparate
treatment by showing several things: '(1) [he] belongs to a racial minority; (2)
[he] was subjected to adverse job action; (3) [his] employer treated similarly
situated employees outside [his] classification more favorably; and (4) [he]
was qualified to do the job.'"

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)(quoting

*Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)(citing *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973)); *see also Burke-Fowler v. Orange County*, 447 F.3d 1319,

1323 (11th Cir. 2006).  In *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185

(11th Cir. 1984), the Eleventh Circuit Court of Appeals held that a plaintiff can establish that

an employer treated similarly-situated employees outside his protected class more favorably

by showing either he was "replaced by one outside the protected class;" or, that he was

disciplined more harshly than one outside the protected class for nearly identical conduct.

*Nix*, 738 F.2d at 1185; *see also Burke-Fowler*, 447 F.3d at 1323 ("When a plaintiff alleges

discriminatory discipline, to determine whether employees are similarly situated, [the court]

evaluates 'whether the employees are involved in or accused of the same or similar conduct

and are disciplined in different ways.'")(quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368

(11th Cir. 1999)).  However –

> Where the racial discrimination is alleged in the application of work rules to discipline an employee, and where there is no claim that the employee did not violate the work rules, as here, then plaintiff must show that he engaged in misconduct similar to that of a person outside the protected class, and . . . the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Rioux v. City of Atlanta*, 520 F.3d 1269, 1276 (11th Cir. 2008)(internal citations and quotations omitted).

In this case, plaintiff contends that he "has established a prima facie case by showing that other white employees were treated more favorably, not merely in the discharge decision, but also in the investigation that led to the discharge and the investigation of other discrimination claims of Floyd and other employees." (Doc. 38 at 32.)  The court disagrees.

First, "[T]he prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)(quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977))(emphasis and internal quotations omitted).  The decision at issue is plaintiff's termination, not the investigation.  Therefore, the prima facie case must show disparate treatment between plaintiff and others outside his protected class – either by showing that he was replaced by someone outside the protected class or someone outside the protected class engaged in nearly identical misconduct and was not terminated. *See Nix*, 738 F.2d at 1185.  A showing that the investigation was unfair may be circumstantial evidence of pretext, but it does not establish a prima facie case of discrimination.

Second, plaintiff alleges that two white employees engaged in nearly identical conduct and were not terminated.  He alleges:  (1) "Floyd was discharged for an altercation started by Bowers in which Bowers was not discharged, (doc. 38 at 37); and  (2) "No disciplinary action was taken against Josh Burnette despite the fact that he and McNair were chest to chest and Josh Burnette, with his hands, pushed David McNair," (*id*.).  Neither Bowers nor Burnette are similarly situated to plaintiff.

"In order to determine whether other employees were similarly situated to [plaintiff], [the court] evaluate[s] whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *McCann v. Tillman*, 526 F.3d 1370, 1373 -1374 (11th Cir. 2008)(quoting *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006)(quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999)))(internal quotations omitted).   "In doing so, the quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  *Id.* (quoting *Burke-Fowler*, 447 F.3d at 1323)(internal quotations omitted).  According to defendant, plaintiff was terminated for hitting Bowers.  Nothing in the record indicates that Bowers hit or attempted to hit plaintiff.  Therefore, Bowers and plaintiff are not similarly situated.

Likewise, the record shows that Burnette and plaintiff are not similarly situated.  Although plaintiff alleges that McNair and Burnette were nose to nose, he testified that

McNair pushed Burnette and Burnette did not take a swing at McNair.  Therefore, Burnette and plaintiff are not similarly situated.[9]

Plaintiff has not demonstrated favorable treatment of similarly-situated white employees; therefore, he has not established a prima facie case of race discrimination with regard to his termination.  *See Nix*, 738 F.2d at 1185.

Nevertheless, even if the court assumes a prima facie case of discrimination, defendant's Motion for Summary Judgment is due to be granted as to plaintiff's race discrimination claim because plaintiff has not demonstrated a disputed issue of fact regarding the truthfulness of defendant's articulated legitimate non-discriminatory reason for plaintiff's termination.  "A plaintiff may show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence."  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  Plaintiff argues that defendant's "proffered explanation is unworthy of credence."  *Id*.  Therefore, the relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons

---

[9]The court notes that Hurst testified that he was unaware of the incident involving Burnette and McNair until after plaintiff was terminated.  Burnette cannot be considered similarly situated to plaintiff unless Hurst and or Wade knew about the altercation between Burnette and McNair.  *See Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th Cir. 2003)(citing *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186 (11th Cir. 1984)).

to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

"To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted); *see Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997)(Evidence of a pretextual explanation can be established by showing "that the employer's proffered reasons are (1) factually baseless, (2) not the actual motivation for the [employment decision]; or (3) insufficient to motivate the [employment decision]."). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)).

Defendant contends that it terminated plaintiff because he hit Bowers. As evidence that defendant's articulated reason is a pretext for intentional discrimination, plaintiff argues (1) the disparate discipline between plaintiff and Bowers and Burnette shows preferential

treatment to white employees, (doc. 38 at 37-38); (2) the disparate investigation between Burnette and plaintiff, (*id*. at 38-39).  As set forth above, the disparate discipline was based on different conduct.  The disparate investigation between plaintiff and Burnette was based on the fact that Hurst, the individual responsible for the investigation, was unaware of any altercation between Burnette and McNair.  This evidence is not sufficient to establish a question of fact regarding the truthfulness of defendant's articulated reason.

In order to establish that a defendant's articulated reason is not worthy of credence –

> "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race]."  [*Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)].  The role of this Court "is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments."  *Id*. at 1254.  "Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  [*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)].  Whether [plaintiff actually hit Bowers] is not an issue for this Court to referee."

*Wilson*, 376 F.3d at 1092.  "In other words, it does not matter whether the plaintiff is actually innocent of the infraction for which the adverse employment action is taken; the only relevant inquiry is whether the employer believes he is guilty."  *Masso v. Miami-Dade County*, No. 06-16611, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007).  Nothing in the record demonstrates sufficient evidence upon which a reasonable jury could find that defendant did not terminate plaintiff because he hit Bowers on August 31, 2006.  Therefore, defendant's Motion for Summary Judgment as to plaintiff's race discrimination claim is due to be granted.

## B. RETALIATION

The court assumes without deciding that plaintiff has established a prima facie case

of retaliation with regard to his termination.  Defendant, as set forth above, contends that

plaintiff was terminated for hitting Bowers.  The court assumes that plaintiff can establish

a prima facie case of retaliation.

Plaintiff alleges that he can show defendant's articulated reason is unworthy of

credence.  He argues:

> A Plaintiff may demonstrate pretext by persuading the court that a discriminatory reason likely motivated the employer or alternately by indirectly showing that employer's proffered explanation is unworthy of credence.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2006 (2000).  It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity or change of the employer's explanation.
>
> Defendant initially claimed Floyd was terminated for "striking" Bowers.  Only now assert the claims that Floyd only grazed Bowers.  Defendant asserted that the second Bowers statement was obtained because of the [GFT] Process.  However, that is false because the [GFT] had not been started.  The Defendant has failed to explain why the Defendant would tell Floyd he was terminated for "striking" Bowers when now Defendant is contending that Bowers was grazed.  Defendant informed Floyd there is a video and their not reviewing the video or producing its video since Defendant changed its story during the course of litigation, a jury may conclude that Defendant's proffered reason is false and was pretext.  *Burrell v. Dr. Pepper/Seven Up Bottling Group*, 482 F. 3d 408, 412 (5th Cir. 2007) holding that when Defendant gives one reason for an adverse employment action and then gives a separate one in litigation, that a jury may find pretext on that basis alone.

(Doc. 38 at 41-42.)  Plaintiff's contentions do not meet defendant's articulated reason "head-

on" and rebut it.  *Springer*, 509 F.3d at 1350.

20

The record shows that defendant considered plaintiff's glancing blow to be a violation of its policy.  The fact that the blow only grazed Bowers was known to defendant and was a part of its decision.  Therefore, the fact that defendant admits plaintiff only grazed Bowers does not establish that its reason for plaintiff's termination has changed or that it was a pretext for retaliation.

As for Bowers's second statement, defendant produced evidence that Bowers was questioned by Wade on September 5, 2006, the day defendant terminated plaintiff, to confirm that plaintiff had actually hit Bowers.  (*See* doc. 33, Ex. J, ex. 24.)  Parker of Human Resources asked Wade to obtain the second written statement from Bowers, which explicitly stated plaintiff had hit him.  The record contains evidence that Bowers reported plaintiff hit him to Hurst, the night of the incident, and to Wade, the day plaintiff was terminated.  Evidence that defendant asked Bowers for a second written statement after it had terminated plaintiff is not evidence from which a reasonable jury could find that defendant did not terminate plaintiff for striking Bowers, because the evidence does not challenge defendant's assertion that it believed Hurst and Wade's account of Bowers's oral statements.

Moreover, the court finds that evidence of the missing video does not inform the determination of any fact in issue.  Nothing in the record indicates that any security video would have been able to capture the incident inside the truck. Therefore, no fact or inference arises from the fact that no security video was reviewed by defendant or produced during discovery.

21

"No matter how medieval [an employer's] practices, no matter how high-handed its decisional process, no matter how mistaken [its] managers, [Title VII] does not interfere. Rather [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)(quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(other citations omitted).

Plaintiff's arguments regarding the grazing blow, Bowers's second written statement, and the security tapes do not create a reasonable inference that defendant's proffered reason for his termination was not an honest explanation. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308-09 (11th Cir. 2007). Therefore, the court finds that plaintiff has not rebutted defendant's articulated reason and defendant is entitled to judgment as a matter of law as to his retaliation claim.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 33), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 30th day of March, 2010.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE